UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ] | |
| ] | No.   13-CR-10276-MLW |
| v. ] | |
| ] | |
| MARGARET MATHES, BOSEBA PRUM, ] | |
| SAM PICH, and THAWORN PROMKET   ] | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government hereby submits this memorandum to aid the Court in sentencing the defendants in this case.

**Introduction**

Between about 2004 and 2012, the defendants ran a long-term tax fraud scheme in the guise of a temporary employment agency based in Lowell, Massachusetts. During that period, the defendants routinely deposited payments from the companies using their temporary workers, and then withdrew cash, consistently in structured amounts, to pay those workers. Paying the workers in cash meant there were no records of the payments or to whom they were made, leaving the defendants free to grossly under-report their payroll figures to tax authorities and workers compensation insurers.

 The numbers are impressive. Between 2004 and 2009, the defendants reported $2,230,725.54 in employee payroll, but failed to report an additional *$25,876,149.82* in wages. This allowed the defendants to avoid paying $5,138,200.03 in federal taxes and $880,545 in workers compensation insurance premiums. Along the way, to facilitate the scheme, the defendants structured literally thousands of withdrawals from various bank accounts, totaling $16,931,496.

According to the Pre-Sentence Reports in this case, based on the losses attributable to the defendants' tax, wire fraud, and structuring offenses, each defendant faces an advisory Guideline range of 63-78 months, followed by supervised release and restitution to the U.S. Internal Revenue Service and Granite State Insurance Company.[1]

The advisory range, however, does not reflect adjustments for relative culpability, an issue the Court will have to address:

*First*, defendant Margaret Mathes – as her co-defendants themselves point out – started, and managed, the illegal activity. Mathes does not contest this point, and agrees that she should receive a two-level role enhancement under U.S.S.G. § 3B1.1(c). The government learned on January 14, 2015, however, that Mathes was recently diagnosed with Alzheimer's Disease. In light of the progressive nature of that illness, and Mathes's advanced age, the government recommends a variance from the advisory Guideline range (discussed further below).

*Second*, as to defendant Sam Pich, he was the day-to-day manager of the temp agency at the heart of this case. He did not assign tasks to others, but he did routinely fashion the nuts-and-bolts falsehoods necessary to pursue the fraud. He also routinely structured bank transactions. Pich deserves a sentence within the Guideline range as calculated by Probation.

*Third*, the two remaining defendants, Boseba Prum (Mathes's daughter) and Thaworn Promket (Ms. Prum's husband), were the named owners of the temp agency: Prum owned INT while Promket owned its successor, JP Company. They signed (or authorized others to sign) every fraudulent tax return for the agency, every check, and all necessary workers compensation paperwork, and made other affirmative misrepresentations to payroll services and others in the

---

[1] The defendants filed no material objections to the offense conduct portion of the Pre-Sentence Reports. They also do not dispute the government's calculations of tax loss, wire fraud loss, and structured amounts, which was a fairly complex analysis considering the number of years and transactions at play. The government appreciates counsel's cooperation in that regard.

course of the fraud. Both defendants seek minor or minimal role adjustments under U.S.S.G. § 3B1.2(a), on the theory that they were merely doing Ms. Mathes's bidding. As discussed below, the adjustment should be denied.

## Argument

Section I below discusses the defendants' roles in the offenses of conviction, while sections II and III discuss how those roles should affect sentencing.

### I. The Defendants' Roles in the Offenses of Conviction

The defendants are members of the same family: Mathes is defendant Boseba Prum's mother; Prum is married to defendant Thaworn Promket; and Sam Pich is married to Mathes's other daughter, Botum Prum, who is not charged. All four defendants played certain necessary roles in the offenses charged in the indictment.

#### A. Margaret Mathes

In approximately 1993, apparently having learned the basics from a friend, Mathes started the temporary agency. The agency had several names over time, in an apparent effort to mask the nature of its activities from government authorities. By 2004, it was called International Temp Agency ("INT"), a sole proprietorship in defendant Boseba Prum's name. *Mathes PSR* ¶ 9; *Prum PSR* ¶ 98 (noting that Mathes asked Prum, as a favor, to put the temp agency in Prum's name). In October 2008, the name was changed to JP Company ("JP"), a sole proprietorship in the name of defendant Thaworn Promket. *Mathes PSR* ¶ 9; *Promket PSR* ¶ 96 ("According to [Promket], Margaret Mathes operated the business. [Promket] states that he did not work at the company but that he occasionally assisted with withdrawals and signed documents.").

According to all three of her co-defendants, not only did Mathes start the temp agency, she ran it.  *See, e.g., Promket PSR* ¶ 96 ("According to [Promket], Margaret Mathes operated the business."); *Pich PSR* ¶ 97 (noting that only two people – Mathes and him – were employees of the temp agency, and Pich was an hourly employee who received no share of profits); *Prum PSR* ¶ 98 ("According to [Prum], her mother asked her to put the company in her name as a favor.  She advises that [Mathes and Pich] operated the business.").  Mathes herself does not deny it; she did not object to the relevant portions of her PSR.  *See Mathes PSR* ¶ 9 ("MATHES managed the various iterations of this temporary employment agency."), ¶ 11 ("MATHES coordinated [the structuring] activity[.]").

Other percipient witnesses support the conclusion that Mathes ran the operation.  For example, Tom Seng, a Lowell resident who ran his own temp agency and provided tax preparation services, shared office space with the defendants' temp agency for over ten years.  Seng observed Mathes and the others on a daily basis, and saw that Mathes ran the business.[2]  Similarly, at least two representatives of companies that used the defendants' temp workers told federal agents in interviews that Mathes was the person who handled issues for them as they arose.

Similarly, in the course of running the temp agency, the defendants used various professional services, including accounting, tax, and payroll preparation firms.  Employees of these companies echo the above.  For example, Hung Phamdo, the owner of a CPA firm called Phamdo Associates, recalled meeting Mathes in 1992.  Mathes had contacted Phamdo because

---

[2] Seng is cooperating with the government under a plea agreement.  Perhaps having observed the defendants' practices a bit too well, in January 2013 Seng pleaded guilty to an information charging him with 20 counts of filing false tax returns, arising from systematically underreporting payroll for his own temp agency in Lowell.  In May 2013, Seng was sentenced to two years' probation and required to pay restitution to the IRS, a disposition that reflected a reduction for cooperating with the government (the initial advisory Guideline range was 30-37 months).

she needed a CPA firm to do payroll work for her temp agency. Later, Don McCauley, owner of Eagle Payroll Services, told agents that when he met Mathes she told him that she was "the real boss" of the temp agency. Charles Sullivan of Sullivan & Wong, another tax preparation service the defendants used, told agents that when he met with Boseba Prum and Sam Pich about the business, Prum would often say, "My mother keeps everything. I don't have it."

Mathes also played the lead role in structuring bank transactions to facilitate the tax fraud, finding others to cash checks and, over time, cashing most of them herself. As stated in the PSR (¶ 20), Mathes structured 2,146 withdrawals, totaling $11,210,780, from 2004 to 2009. The next closest defendant was Sam Pich, who structured 662, followed by Promket (169), and Prum (127). According to Tom Seng, Mathes candidly told him that she avoided transactions of over $10,000 because she did not want the banks "filing papers," or words to that effect. (Seng himself cashed some checks, at Mathes's request.)

On January 14, 2015, counsel for Mathes sent the government medical records showing that Mathes has recently been diagnosed with Alzheimer's Disease. The government and counsel for Ms. Mathes will discuss the diagnosis with Mathes's physician next week. Because of the progressive nature of this illness, the government concedes that it should affect the sentence the Court ultimately imposes.

   B.  **<u>Sam Pich</u>**

Sam Pich, Mathes's son-in-law, was also actively involved in running the business. Pich was the office manager for both INT and JP, maintaining the agency's book and records and calling in payroll and tax figures to the professional services the agency used. *See Pich PSR* ¶ 13 n.3.

Several of those outside services remember dealing with Pich, that is, Pich was the one who fed them fraudulently low figures for employee payroll, which they then used for the agency's tax and workers compensation filing. For example, Phamdo Associates received wage information for the agency's temp workers primarily from Pich. *Id.* ¶ 13. Similarly, when the defendants switched the temp agency name from INT to JP, Pich and Promket met with a new tax preparer, Gorman Tax Services. The defendants told Gorman several lies, including that JP was a new "start-up" business, and provided substantially false wage and client information. *Id.* ¶ 14. Later, for the 2009 tax year, Gorman asked Pich several questions about certain anomalies in the information the agency had provided. Pich again lied (*e.g.*, about the number of bank accounts the agency actually had), and Gorman dropped the agency as a client soon afterward. *Id.* ¶ 15.

Pich also helped deceive the workers compensation insurance auditors. In or about July 2008, he gave them a letter Boseba Prum had written that month, which falsely stated that the agency only had about 50 workers and three client companies. Pich attached fake spreadsheets as well. *Pich PSR* ¶¶ 23, 25. Finally, on April 13, 2010, Pich agreed to be interviewed by IRS agents. Pich lied to the agents, telling them that JP Company only had three clients, all paid by check. *Id.* ¶ 26.

As noted above, Pich also structured transactions to assist the tax fraud, totaling 662 transactions between 2004 and 2009 (about 100 per year), which amounted to $4,352,619.

    **C.**    **Boseba Prum and Thaworn Promket**

Boseba Prum (Mathes's daughter) and Thaworn Promket (Prum's husband) played a key role in the scheme, in that both were the named owners of the temp agency at different times. From about 2004 – 2008, the temp agency, under the name of INT, was on paper a sole

6

proprietorship owned by Prum.  From 2008 – 2009, under the name JP Company, the agency was on paper owned by Promket.  *See Prum PSR* ¶  9; *Promket PSR* ¶ 9.

It appears that Prum and Promket acted as the agency's owner at Mathes's behest, *e.g., Prum PSR* ¶ 98, *Promket PSR* ¶  96, but this does not mean that they otherwise played no role in the fraud.  Prum and Promket, on behalf of the agency, signed, or permitted others to sign, every business tax return filed by the agency between 2004 and 2009, and did it knowing that the returns grossly underreported agency payroll.  *See Prum & Promket PSRs* ¶¶ 13-14.  Similarly, Prum opened approximately 14 bank accounts, and Promket approximately 13, to hold funds generated by the agency's business, and did it to help shuffle and hide business proceeds from the agency's payroll and tax services.  Note that this means that Prum and Promket, during the six-year period that they acted as owners of the agency, signed – literally – *thousands* of checks: checks covering legitimate payroll paid through the payroll companies, checks used to pay workers directly, and the thousands of checks used in structured transactions to withdraw cash and pay workers under the table.

In their roles as owners, Prum and Promket also made affirmative misrepresentations to outside payroll and tax services during the fraud, and especially to the workers compensation insurer.  The PSRs summarize this activity (emphasis added by the government), and the defendants do not dispute it:

> <u>On April 1, 2003, PRUM submitted an application for WC [workers compensation] insurance under the name "Boseba Prum DBA International Temps."</u>  PRUM sent the application to an insurance agent, who then submitted the application to the Massachusetts Workers Compensation Ratings and Inspection Bureau ("WCRIB").  In accordance with its procedures, WCRIB then assigned a WC insurance carrier to INT.  That carrier was Granite State.  The application that PRUM submitted represented INT as a new business, when in fact INT was a new name given to a temporary agency that had been operated under a variety of names by PRUM, MATHES, and others for years prior.  The application represented the following: that the

7

business had not changed its name within the last five years; that the applicant had not acquired the physical assets of another entity whose operations they had taken over within the last five years; and that the owners or officers had not maintained an ownership interest in another entity currently or previously existing. <u>All of these representations were false. PRUM also signed a statement falsely attesting that INT provided only temporary workers to its clients and not long-term workers (employment agencies providing long-term workers are required under Massachusetts law to secure separate policies covering workers at each client site). Most importantly, the application falsely listed INT's number of employees as "2" and the total remuneration paid to those employees as $12,000. Both statements were false</u>.

AIG, on behalf of Granite State, periodically audited INT to confirm, at the end of the policy periods, the actual amounts of payroll for the policy terms. <u>During these audits, PRUM and PICH concealed the true number of INT's employees from the auditors</u>, revealing only wages kept "on the books" – that is, wages paid by check through the payroll companies, from which the appropriate employment taxes had been withheld. . . .

<u>The process repeated itself as the defendants transitioned their employment agency from the name INT to JP. On March 28, 2008, PROMKET applied for WC insurance under the name "Thaworn Promket DBA JP Company." The application made similar representations</u> about being a new business without any connection to a previous business and providing only temporary workers to its clients. It also listed its number of employees as "3" and its total remuneration paid to those employees as $46,800. <u>Both statements were false. WCRIB assigned Granite State as JP's insurance carrier, and during periodic audits, PROMKET and PICH gave AIG false information similar to that provided in the previous audits. PROMKET and PICH concealed JP's cash payroll, leading to the payment of artificially low premiums</u>.

<u>On July 23, 2008, PRUM provided a letter to PA, which prepared INT's Forms 940 and 941, that drastically understated INT's payroll</u>. On that same date, PICH gave the same letter to the WC insurance auditor. PICH also attached two spreadsheets: one titled "Report of Worker's Compensation 04/05/07 to 04/05/08," and the other titled "Payroll Report 4/5/2007 to 4/5/2008." Both spreadsheets purported to list INT's total employees, but in fact omitted most of them.

In 2010, AIG audited INT's payroll for the worker's compensation policy year that ran from April 2007 to April 2008, for purposes of determining INT's WC insurance premium. <u>During this audit, PRUM gave the auditor information about only those employees who had been paid out of the two Enterprise Bank accounts that had been disclosed to PA and Gorman in previous years</u>. . . .

8

*Prum & Promket PSRs* ¶¶ 22-26.

In keeping with the above, in interviews with agents the principals of certain outside companies recalled receiving information from Prum and Promket that we now know was false, *e.g.*, Charles Sullivan and Hanna Wong of the accounting firm Sullivan & Wong, and Melissa Pierce of Phamdo Associates.

Like the other defendants, both Prum and Promket also structured bank transactions to facilitate the tax fraud. *See Prum & Promket PSRs* ¶ 20. While it is true that they structured fewer transactions than Mathes and Pich, the fact remains that each of them intentionally evaded bank currency reporting requirements *over a hundred times each*.[3]

Finally, in the realm of relevant conduct under U.S.S.G. § 1B1.3 – and unlike the other defendants – Prum and Promket lied on their personal tax returns as well as on the agency's tax returns. *See Prum & Promket PSRs* ¶¶ 17, 28. Because, at different times, they were listed as the owners of the agency, not only did they swear to and file fraudulent business tax returns, but they understated whatever business income passed through to their personal returns. In this manner Prum caused an additional $563,918 of tax loss via her 2008 personal return, and Promket caused an additional $127,433 of loss via his 2009 return.

## II.     Margaret Mathes Should be Sentenced to 48 Months in Prison

Based on the above summary of her conduct, Mathes deserves a two-level role enhancement for initiating, leading and supervising the illegal activity charged in the indictment. *See* U.S.S.G. § 3B1.1(c). Mathes does not contest the enhancement. *See also, e.g., United States*

---

[3] Prum structured 127 transactions; Promket structured 169. *See Prum & Promket PSRs* ¶ 20.

*v. Cruz*, 120 F.3d 1, 3 (1st Cir. 1997);[4] *United States v. Prange*, 771 F.3d 17, 34 (1st Cir. 2014) (noting relatively low bar for this enhancement). In light of the enhancement, Mathes's adjusted offense level would be 28, and her advisory range would be 78-97 months.

That said, in light of Mathes's recent diagnosis of Alzheimer's Disease and dementia, coupled with her age, there is no question that a term of incarceration will be harder for her than for the average defendant. Although at the moment Mathes is fully functional,[5] Alzheimer's is a progressive disease with no cure, as opposed to a serious, but stable, condition that can be effectively treated within the Bureau of Prisons's medical facilities. Consequently, the government suggests a downward variance from Mathes's advisory range of just under 50%, to 48 months, followed by three years of supervised release, and restitution (jointly and severally with the other defendants) to the U.S. Internal Revenue Service ("IRS") and relevant workers compensation insurer.

Even considering her physical condition, Mathes deserves the sentence. This was a massive tax fraud extending over many years. The defendants successfully hid about $28,000,000 in wages and caused the U.S. Treasury over $5,000,000 in losses. The scheme required thousands of deceptive acts, some petty, like structuring a bank withdrawal, and some significant, like swearing to false tax returns, deceiving accountants and other outside

---

[4] "Role-in-the-offense adjustments address concerns of relative responsibility. *See* USSG § 3B1.1(c), comment (backg'd). In this vein, the Guideline provides, among other things, that "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving one to three other participants, the offense level should be increased by two levels. USSG § 3B1.1(c). Such an increase is justified if the sentencing court supportably finds that (1) the criminal enterprise involved at least two complicit participants (of whom the defendant may be counted as one), and (2) the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons."

[5] Functional enough to trigger a Suspicious Activity Report from Western Union for her convoluted wiring activity during the same month she received her diagnosis.

10

professionals, and defrauding workers compensation auditors.  Mathes initiated, and managed, all of it.

### III. The Remaining Defendants Should be Sentenced to 63 Months in Prison

The other defendants, Pich, Prum and Promket, vary slightly in their roles, but all fall within that wide band of culpability that is short of a role enhancement but well above the bar for a role reduction.  All three are fully functioning adults who knew the nature of the fraud and its extent, and yet for years all three routinely participated in it.  As discussed above, Pich was the office manager for INT, and then for JP, and directly facilitated defrauding the payroll and accounting services that helped the agency complete its tax and workers compensation filings each year.  Prum and Promket owned the business, and it is they who put "pen to paper" and swore that dozens of quarterly and yearly business returns were accurate, when in fact they were fraudulent.  Prum and Promket similarly defrauded workers compensation insurance and audit personnel, opened bank accounts to facilitate the fraud, and structured bank transactions.

Because of the scope of their involvement, neither Prum nor Promket deserve a minor role adjustment (much less a minimal role adjustment).  "The essential predicate is a showing that the defendant is both less culpable than his confederates (or, at least, most of them) and less culpable than the mine-run of those who have committed similar crimes." *United States v. Garcia-Ortiz*, 657 F.3d 25, 29 (1st Cir. 2011); *see also, e.g., United States v. Coviello*, 225 F.3d 54, 67 (1st Cir. 2000) (to receive adjustment, defendant must be "substantially less culpable than the average participant" in that kind of crime).

Moreover, "[t]he fact that some other accomplice may be more culpable than the defendant does not necessarily mean that the defendant's role in the offense is minor." *Id*. at 29-30; *see, e.g., United States v. Brandon*, 17 F.3d 409, 462 (1st Cir. 1994) (loan financing scheme

11

with multiple defendants; court declined minor role reduction because although less culpable than certain others, defendant nonetheless made a "significant contribution"); *United States v. Patriarca*, 912 F. Supp. 596, 621 (D. Mass. 1995) (denying minor role adjustment where defendant "less important" in extortion scheme than other defendant, but made "distinct contribution" that was "material, rather than peripheral").

So it is here. Prum and Promket had different roles in the scheme than Mathes and Pich, but their roles were crucial nonetheless, and as large or larger than the average participant in such a scheme. *See United States v. Vargas*, 560 F.3d 45, 51 (1st Cir. 2009) ("A defendant who participates in only one phase of a conspiracy may nonetheless be found to play a non-minor role in the conspiracy as a whole."). It is they, after all, who signed (or let others sign) the fraudulent returns for INT and JP, contributions that were certainly "material" to the scheme's ongoing success. Prum and Promket are also *the sole defendants* in Counts 2-11 (Prum) and 12-18 (Promket) of the indictment; regardless of the overall conspiracy, they surely were not "minor" or "minimal" participants in the misconduct they directly committed.

Pich, Prum and Promket should be sentenced to 63 months in prison, followed by three years of supervised release and restitution to the IRS and the workers compensation insurer. As noted above, the fraud was impressive in scope, requiring thousands of fraudulent acts spanning years. (In that time, it appears that the four defendants sank the illicit gains into real estate and gambling.) A proportional punishment is warranted. Moreover, while specific deterrence may or may not be an issue for these defendants, general deterrence is certainly a factor; this kind of fraud is rampant among temp agencies, in Lowell and elsewhere.

As a final note, the government is aware that defendants Prum and Promket, who are husband and wife, have five children, ages 21, 19, 17, 13, and 10. While these defendants should

have prioritized their childrens' welfare by declining to participate in a long-term fraud scheme, the government is not insensitive to the issue of the younger children's care.  The government does not object to partial staggering of sentences for Prum and Promket, or to other steps that might minimize the impact of their sentences on the children.

## **Conclusion**

For the foregoing reasons, defendant Margaret Mathes should be sentenced to 48 months in prison, while defendants Sam Pich, Boseba Prum and Thaworn Promket should each be sentenced to 63 months.  All four defendants should be subject to three years of supervised release, and be required to pay restitution to the IRS ($5,702,118.03) and Granite State Insurance Company ($880,545).

    Respectfully submitted,

    CARMEN M. ORTIZ
    United States Attorney

By:    /s/ *Andrew E. Lelling*
    ANDREW E. LELLING
    Assistant U.S. Attorney
    1 Courthouse Way
    Boston, MA  02210
    617-748-3177
    andrew.lelling@usdoj.gov

Date:   January 15, 2015

```
```
```
```

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, on January 15, 2015.

/s/ *Andrew E. Lelling*
ANDREW E. LELLING
Assistant U.S. Attorney